(No. 21459.—

AUGUSTE KUHNEN, Appellant, *vs.* KARL P. KUHNEN *et al.*
Appellees.

*Opinion filed February 23, 1933—Rehearing denied April 5, 1933.*

JACOB LEVY, and A. M. LONDON, (JAMES M. GWIN, of
counsel,) for appellant.

WINSTON, STRAWN & SHAW, (SILAS H. STRAWN, and FRANK H. TOWNER, of counsel,) for appellees.

Mr. JUSTICE DUNCAN delivered the opinion of the court:

This is an appeal from a decree of the circuit court of Cook county dismissing a bill filed by appellant, Auguste Kuhnen, (herein called complainant,) to set aside an ante-nuptial agreement between her and Nicholas Kuhnen, deceased.

The undisputed facts as shown by the record are as follows: Nicholas Kuhnen was married to Emma Kuhnen and they lived together as man and wife for more than twenty years and until her death. They had two sons, Karl P. and Arthur N. Kuhnen (herein referred to as defendants). In January, 1923, complainant, who was then a widow, named Auguste Sachau, having one son, became acquainted with Nicholas and Emma Kuhnen. Emma died in July, 1926. On August 12, 1927, complainant and Kuhnen were each about the age of sixty-seven years and on that date executed an ante-nuptial contract which recited that the parties contemplated marriage with each other, and by which it was agreed that if the marriage was consummated neither party should have, take or claim, by virtue of the marriage, any right or title of any kind in the property, real or personal, of the other. The contract provided that in case complainant should survive Kuhnen she was to have and take, in lieu of dower and all other statutory or common law rights in his property, the sum of $5000 from his estate and the household furnishings and furniture in the second apartment at 1620 Cullom avenue, in Chicago, and should have the free use of said apartment during her life, or if the premises where said apartment was located were sold by Kuhnen's heirs or devisees and she had to vacate the apartment, she was to have and receive from the heirs or devisees $100 a month during her life. At the time the contract was executed Kuhnen owned

real estate in the city of Chicago on Cullom avenue, on Ashland avenue and on North Dearborn street, of the total value of about $555,000, which was mortgaged to secure an indebtedness of $218,000. Complainant and Kuhnen were married on September 20, 1927, and thereafter lived together as man and wife until his death, on October 30, 1929. No children were born of the marriage. After Kuhnen's death complainant continued to occupy the apartment on the second floor of the building at 1620 Cullom avenue, where she and Kuhnen had lived together, and retained possession of the furniture and furnishings in the apartment.

In her bill, which was filed on January 21, 1930, complainant made the following allegations in substance: She and Kuhnen became engaged to be married on March 10, 1927, prior to the execution of the ante-nuptial agreement. At that time she had "a little property from which she derived a small income, and also a small amount of securities." Prior to the engagement she had no information of the property Kuhnen owned or the value thereof, except that he owned some real estate and was not a man of much wealth. Shortly after the engagement he represented to her that the personal property owned by him was not to exceed $2500 in value and that his real estate was worth not to exceed $12,500. She did not learn of the extent and value of his property until after the ante-nuptial contract had been executed and the marriage consummated. She was induced to sign the ante-nuptial agreement by fraud and deceit, and the provisions for her in the agreement were inadequate and grossly disproportionate to the amount she would otherwise have been entitled to as Kuhnen's widow.

The defendants, Karl P. and Arthur N. Kuhnen, the sons and only heirs of Nicholas Kuhnen, their wives and the administrator of Kuhnen's estate, were made parties defendant to the bill. Answers and replications were filed

and the cause was referred to a master in chancery to take and report the evidence with his conclusions of law and fact. The master made his report, in which he recommended a decree setting aside the ante-nuptial contract, in accordance with the prayer of the bill. Objections to the report were overruled by the master and were ordered to stand as exceptions thereto before the court. The court sustained the exceptions and entered a decree dismissing the bill for want of equity.

The only evidence in chief introduced by complainant, other than testimony as to the nature and value of the real estate owned by Kuhnen at the time the ante-nuptial agreement was executed, was the testimony of Eliza Beck, which is substantially as follows: She was sixty-nine years old and had known complainant all her life. She met her in the "old country." Witness came to this country in 1882 and had lived for six years at 1418 Byron street, in Chicago. She first met Kuhnen at her home in Chicago about March 6 or 7, 1927, when he came there with complainant. He came to her home and met complainant there several times in March, 1927. A "couple of days" after witness had been introduced to Kuhnen he came to her house and asked her what complainant thought of him and whether she wanted to marry him. Witness replied, "Well, if she could do better than she had just now, maybe she would; she is not marrying a man that don't got nothing." He then said that he had a two-story house, and was worth, "with a couple of mortgages, $15,000," and that he lived in his son's house and paid no rent. About an hour later complainant came to witness' house, and then, in witness' presence, Kuhnen told complainant that he wanted to marry her, and repeated to her the same statement that he had made to witness about his financial condition. He told her that he was living in his son's house, on Ashland avenue, and that he lived in his own flat. Complainant replied, "If that is what you have then I will get

married to you." On direct examination the witness said that Kuhnen had called at her home five or six times before the call at which the foregoing conversation took place, but on cross-examination she stated that it occurred either the second or third time that she had seen him. She further stated that about two days later, in March, 1927, Kuhnen came to her home when complainant was there and gave complainant a necklace as an engagement present and said they would be married the next month. Complainant said, "Oh, no; nothing doing; let your wife be dead a year anyway," and Kuhnen said, "All right."

The real property owned by Kuhnen at the time of his marriage to complainant consisted of an apartment building on Dearborn street, all of the property on the north side of Cullom avenue between Paulina street on the west and Ashland avenue on the east, consisting of three apartment buildings, and an apartment building facing on Ashland avenue just north of the building at Ashland and Cullom avenues. The building at the corner of Paulina street and Cullom avenue, 1620-24 Cullom avenue, was completed in the summer of 1927. It was valued at about $138,550. The building immediately east of that was an old building valued at about $8000. The building at the corner of Cullom and Ashland avenues was completed in the fall of 1925. It and the building immediately north of it on Ashland avenue were valued at about $146,000 and $102,250, respectively. The Dearborn street property was valued at about $160,000. There is no showing in the record that Kuhnen had any personal property at the time of the execution of the ante-nuptial agreement, at the time of his marriage to complainant or at his death.

The following named six witnesses testified for defendants substantially as follows:

Hugh O'Neill, an attorney at law of Chicago: In July, 1927, Kuhnen and complainant came to his office by appointment previously made by telephone by Kuhnen. Com-

plainant was introduced by Kuhnen as his intended wife and said that they wanted an ante-nuptial agreement drawn. Witness asked if each was acquainted with the property owned by the other. Kuhnen then, in complainant's presence, stated that he owned the real estate on Cullom avenue, Ashland avenue and Dearborn street that has heretofore been mentioned; that complainant was well acquainted with and had seen the property; that the property was said to be worth, all together, $400,000 or $500,000, and that it was encumbered for about $220,000. Complainant stated that she had been an old friend of Kuhnen's family and knew what property he owned; that she had visited the buildings owned by him, but that she was not marrying him for his money and that she had some property of her own. Kuhnen then stated the terms agreed upon for the ante-nuptial agreement. Complainant then said that Kuhnen had correctly stated the terms of the agreement between them. Witness subsequently drafted the contract, setting forth the terms stated by Kuhnen and assented to by complainant and notified Kuhnen that the contract had been written. Kuhnen and complainant thereafter came to witness' office together, and he gave each of them a copy of the contract and read aloud a third copy in their presence. The contract was not executed at that time but each party thereto took a copy. They returned to witness' office on August 12, 1927, and on that day the contract was signed in duplicate by complainant and Kuhnen and by witness and Edith Weis, his stenographer, as witnesses.

Dr. Margaret Wilkenloh, of Chicago, a physician for thirty-six years: She had known complainant for thirty-five years. In the fall of 1924 she and complainant, who was then "more or less sick," went to Miami, Florida. In October of that year complainant bought a house and lot in Miami for $8000 and paid for it in cash. While in Florida in January, 1925, witness met Kuhnen and his then wife, to whom she was introduced by complainant, and

from that time until the latter part of March of that year, when witness returned to Chicago, she and complainant saw and talked to the Kuhnens often. Witness heard Kuhnen, in the presence of complainant, talk about the building he was to have erected that year at the corner of Ashland and Cullom avenues, in Chicago. Complainant returned to Chicago from Florida in the first part of May, 1925. Later in that month she and witness visited the Kuhnens in their apartment in the old building on Cullom avenue. The building at Cullom and Ashland avenues was being erected at that time by Kuhnen and there was some conversation about the building. In September, 1925, complainant and witness again visited the Kuhnens together. The building on the corner was then completed and Mr. and Mrs. Kuhnen said to complainant that they had torn down their old building that stood on that corner and erected the new one in its place. That was on Sunday. In the afternoon the Kuhnens took complainant and witness for an automobile ride. They drove past Kuhnen's building on Dearborn street and complainant pointed out to witness the building and said that it belonged to Kuhnen. Complainant was in Florida during the winter of 1925-26. After she returned to Chicago in the spring of 1926 witness and complainant in May of that year attended a dinner at Kuhnen's home. Mrs. Kuhnen's two sisters and defendant Karl P. Kuhnen were there. After dinner Kuhnen displayed the plans for the building he was to have erected at Cullom avenue and Paulina street and asked the guests to express their opinions of the plans. Complainant lived with witness during the summer of 1926. She told witness that she had property in Florida worth $200,000. Complainant was in Florida for the winter of 1926-27. She returned to Chicago in the month of April, 1927. Kuhnen brought her from the train to witness' apartment. Complainant was not feeling well and was in bed for three or four weeeks thereafter. She lived with witness during the summer of 1927 and un-

til she and Kuhnen were married. Kuhnen visited her at witness' home during that summer, and witness heard him talk to complainant about the building he had completed at Paulina street and Cullom avenue.

Frank A. Knipschild, of Chicago: His wife was a sister of Emma Kuhnen. He and his wife and sister-in-law, Mrs. Keick, attended a dinner party at Kuhnen's apartment in May, 1926. Complainant and a number of other people were there. After dinner Kuhnen showed his guests the plans for the building he was to have erected at Cullom avenue and Paulina street. Nothing was said by complainant about the plans. Witness did not hear her say anything.

Charles Freund, a carpenter: He was a carpenter foreman and was working in 1927 on the building Kuhnen was erecting at 1620 Cullom avenue. One afternoon in the latter part of July of that year, when the building had been almost completed, Kuhnen, accompanied by complainant and one of his sons, came to the building and spent some time in an apartment on the second floor. Witness was introduced to complainant, and Kuhnen said he was trying to put up a better building than the one on Ashland avenue. Witness replied, "You are; both the buildings on Ashland and Cullom are good buildings."

John P. Anderson, of Chicago, a mason contractor and builder: He went to Florida in January, 1927, and stayed there until some time in April, 1927. Kuhnen was there during that time. Witness saw him practically every day. Kuhnen left there on March 15 or 16, 1927. Witness accompanied him to the train at the time he left.

Karl P. Kuhnen, son of Nicholas Kuhnen and a defendant: On November 16, 1929, complainant asked him if she could not get some money on the $5000 provided for her by the ante-nuptial agreement. He asked her to his office and there told her that she could have the full $5000 if she wanted it, but she said she wanted only $300. He wrote a check for $300 payable to her. He gave her the

check and a receipt for the $300, which he asked her to sign. The receipt had been written before that time by attorney O'Neill. She read the receipt and signed it. She then endorsed the check and he gave her $300 in cash. Complainant paid no rent for the apartment occupied by her since Kuhnen's death. The receipt was introduced in evidence. It recited that by the terms of the ante-nuptial agreement complainant was to have $5000 from Kuhnen's estate, and by it she acknowledged the receipt of $300 as part payment on the $5000.

Auguste Kuhnen, complainant, in rebuttal: She did not sign said receipt, but the endorsement of her name on the check was her signature. Karl Kuhnen loaned her $300 on November 16, 1929, but nothing was then said about the ante-nuptial agreement. She returned to Chicago from Florida on March 5, 1927. She never was at the Dearborn street property in an automobile with Dr. Wilkenloh and never told her that Kuhnen owned that property. On the afternoon the Kuhnens took her and Dr. Wilkenloh for an automobile ride they went to Evanston and did not drive by the Dearborn street property. She was never at a meal at Kuhnen's apartment when Dr. Wilkenloh and witness Knipschild were there. Kuhnen did not bring out the plans for a new building and show them to her when she was at his home. She was at witness O'Neill's office one time, only, and that was on September 20, 1927. After Kuhnen died she told Karl Kuhnen that she was going to move out of the apartment where she and Kuhnen had lived, and he told her to stay there and forget about the "marriage contract."

Howard A. Rounds, an expert in forged and disputed handwriting, testified that in his opinion the signature on the receipt aforesaid was not in the handwriting of the same person who signed complainant's name to the ante-nuptial agreement and who endorsed her name on the check, and gave his reasons for his opinion. Two witnesses, Sam-

uel J. Shaeffer and S. A. Hoffman, attorneys at law, testified that the reputation of witness O'Neill for truth and veracity was bad. It appears by stipulation that O'Neill, as attorney for the defendants, Karl P. and Arthur N. Kuhnen, made application for the probate of a will of Nicholas Kuhnen, and that after a hearing, December 11, 1929, probate of the will was denied because Kuhnen and complainant had been married after the will was executed. It also appears that O'Neill was one of the attorneys of record for defendants in the circuit court but withdrew as such attorney on January 9, 1931, three days before he was called as a witness before the master.

It is the contention of complainant that the court erred in sustaining the exceptions to the master's report and in dismissing her bill for want of equity, and that under the evidence she is entitled to a decree setting aside the ante-nuptial agreement because the evidence shows that she and Kuhnen were engaged to be married at the time the ante-nuptial agreement was executed and does not show that she was informed before that agreement was executed of the nature and extent of Kuhnen's property.

Persons having legal capacity to contract may make a valid ante-nuptial agreement. Such agreements are not contrary to public policy and will, ordinarily, be enforced. (*Dickason* v. *English,* 272 Ill. 368; *Becker* v. *Becker,* 241 id. 423; *Kroell* v. *Kroell,* 219 id. 105.) Where a wife after her husband's death seeks to set aside an ante-nuptial agreement between them by which the provisions made for her are disproportionate to the husband's means and does not allege and prove that they were engaged to be married at the time the contract was executed, the burden is on her to prove that she was not fully informed of the property owned by him and its value. (*Mann* v. *Mann,* 270 Ill. 83.) If in such case, however, there is an allegation and proof of an engagement to be married at the time the contract was executed, the burden is upon those persons claim-

ing the validity of the contract to prove that she had, or ought to be charged with, full knowledge of the extent of her intended husband's property. *Brown* v. *Brown,* 329 Ill. 198; *Debolt* v. *Blackburn,* 328 id. 420; *Parker* v. *Gray,* 317 id. 468.

That the provisions of the contract for the complainant are disproportionate to the means of Kuhnen at the time the contract was executed is conceded by defendants. The only evidence of an engagement to be married existing at the time the ante-nuptial agreement was executed is the testimony of Eliza Beck. Her testimony that she met Kuhnen at her home in Chicago on March 6 or 7, 1927, and that complainant and Kuhnen became engaged to be married about two days later, is contradicted by the testimony of Dr. Wilkenloh that complainant did not return to Chicago from Florida in 1927 until April, and by the testimony of witness Anderson that Kuhnen did not leave Florida in 1927 before March 15. On the other hand, complainant testified that she got back to Chicago from Florida on March 5, 1927.

It is contended by defendants that in view of the contradiction of witness Beck's testimony by other witnesses, and the improbability that Kuhnen would discuss with her his desire to marry complainant on the second or third time he met her, the evidence does not establish that there was an engagement to be married at the time the ante-nuptial contract was executed. We do not deem it necessary to pass on that question but will discuss and decide the case on the assumption that complainant's evidence established that there was an engagement between the parties at the time the ante-nuptial agreement was executed.

It is contended by complainant that the testimony of witness O'Neill is entitled to no credit as he was impeached, because contradictions in his testimony were developed on cross-examination, and for the reason he had been an attorney of record for defendants in the case and represented

them as their attorney in other matters. We find no contradictions of a material nature in the testimony of this witness as developed by an unusually lengthy cross-examination, but for the other reasons assigned we agree with complainant's contention that his testimony should be given no consideration except where it is corroborated by other testimony or facts and circumstances shown by the evidence.

The testimony of witnesses Freund, Knipschild and Dr. Wilkenloh, when considered with all the circumstances of the case, was sufficient, in our judgment, to establish that complainant, at the time the ante-nuptial contract was executed, was informed of, or should be charged with knowledge of, the character and extent of Kuhnen's property. There is no contention that complainant did not fully understand the terms of the contract at the time she signed it. One of the provisions of the contract is that complainant should have the right to occupy the second apartment in the building at 1620 Cullom avenue for her lifetime in case she survived Kuhnen. When this provision of the contract is considered with the testimony for defendants it appears to be conclusively established that complainant must have known that Kuhnen owned the building where that apartment was located, which is the building at Cullom avenue and Paulina street that was erected in 1927 and which was valued at $138,550. The testimony of Dr. Wilkenloh of statements made by Kuhnen, in the presence of complainant, of his ownership of the property on Ashland avenue and on Cullom avenue was not denied by complainant when she testified as a witness in rebuttal, and that testimony, when considered with the fact that complainant had been a friend of the Kuhnen family for a number of years and had visited at their apartment located in the old building on Cullom avenue when the building at Cullom and Ashland avenues was being erected, we consider sufficient to establish her knowledge of the ownership by Kuhnen of the property on Cullom avenue and on Ash-

land avenue. Dr. Wilkenloh's testimony that complainant pointed out to her the Dearborn street building and told her that it belonged to Kuhnen was denied by complainant, but she was an interested witness, and, so far as is disclosed by the record, Dr. Wilkenloh had no interest whatever in the result of the litigation. She had been a friend of complainant for many years and there is no showing of any motive on her part to testify falsely, except that shortly after complainant's marriage she and Dr. Wilkenloh had a disagreement and did not see each other thereafter. Complainant contends that on cross-examination many contradictions in her testimony were made by Dr. Wilkenloh, but our examination of her testimony discloses no contradictions of any material matter that would tend to discredit her testimony.

If the testimony of complainant's witness Beck is true, complainant was interested in knowing of the financial condition of any man to whom she might become engaged to be married, and when the testimony is considered in the light of the acquaintance of complainant with Kuhnen and his first wife, and the fact that all of Kuhnen's property was real estate, we are satisfied that complainant knew, when the ante-nuptial agreement was executed, of the nature and extent of that property and from her experience must have had a reasonable idea of its value. It is true that the testimony for complainant in rebuttal tends to show that the signature of complainant's name on the receipt for the $300 was forged. It is also true that the fabrication of evidence raises a presumption that the supposed cause of action or defense of the party guilty thereof is without substantial foundation. (*Winchell* v. *Edwards,* 57 Ill. 41.) Such presumption cannot prevail, however, where the other evidence in the case establishes the cause of action or the defense. As we have above stated, we have concluded from the evidence in this record that com-

plainant should be charged with knowledge of the nature, extent and value of Kuhnen's property at the time the antenuptial agreement was executed. Since that is true, the circuit court did not err in dismissing complainant's bill for want of equity.

The decree of the circuit court is affirmed.

*Decree affirmed.*